UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 14-20743-drd |
| STEVEN ANDREW MILTENBERGER and | § | |
| SONDRA K. MILTENBERGER, | § | Chapter 7 |
| | § | |
| Debtors. | § | |

| | | |
|---|---|---|
| PHILLIPS 66 COMPANY, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary Proceeding |
| | § | No. 14-02024-drd |
| STEVEN ANDREW MILTENBERGER and | § | |
| SONDRA K. MILTENBERGER, | § | |
| | § | |
| Defendants | § | |

**MEMORANDUM OPINION**

Phillips 66 Company (the "Plaintiff") filed a complaint seeking a determination that the debt owed to the Plaintiff by Steven Andrew Miltenberger and Sondra K. Miltenberger (collectively, the "Debtors") is not dischargeable pursuant to 11 U.S.C. §523(a)(2).[1] This is a core proceeding under 28 U.S.C. §157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§1334(b), 157(a) and 157(b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons that follow, the Court finds that the debt owed by the Debtors to the Plaintiff is not excepted from discharge.

---

[1] On February 17, 2015, the parties entered into a Stipulation of Dismissal of Sondra K. Miltenberger whereby the Plaintiff dismissed its claims in this action against her without prejudice.

1

I.     FACTUAL BACKGROUND

The following facts have been stipulated by the parties. Steven Miltenberger (the "Defendant") was the President and Secretary of Jump Oil Co., Inc. ("Jump Oil"), a marketer of gasoline and petroleum-based distillate products, from its inception in 2003 through December 31, 2013. In 2004, ConocoPhillips Company ("Conoco") and Miltenberger Oil Co., Inc. executed a Branded Marketer Agreement (the "2004 BMA") that was later assigned to Jump Oil. The Defendant signed the 2004 BMA on behalf of Miltenberger Oil as its President. He also signed updated BMAs in that capacity in 2007 and 2010.

The owners of Jump Oil in 2004 were the Debtors, Jason Miltenberger (the Defendant's brother) and his wife, Melissa, and David Miltenberger (another brother). These owners each executed guaranty agreements that guaranteed Jump Oil's then existing and future indebtedness to Conoco. The guarantee agreement signed by Jason Miltenberger, and purportedly Melissa Miltenberger (the "Guaranty"), was notarized by Becky Bledsoe ("Bledsoe"), the Defendant's secretary.[2]

Jump Oil executed a Brand Incentive Program Agreement (the "BIP") with Conoco in 2009. While the BIP was executed in connection with the 2007 BMA, the BIP continued to be effective after the execution of the 2010 BMA. Under the BIP, among other things, Conoco provided monetary incentive payments to Jump Oil. Jump Oil agreed to remain current on Conoco's brand and image standards and to purchase a minimum volume of gasoline and distillates from Conoco. The BIP provided that in the event the 2010 BMA was terminated, Jump Oil would be responsible for repaying a certain percentage of the incentive payments based on the number of years Jump Oil had been enrolled in the program. The same would hold true if Jump Oil failed to purchase the required minimum amount of gasoline and distillates.

---

[2] Bledsoe previously worked as the secretary of the Defendant's father until he retired.

Jump Oil failed to pay all amounts due under the 2010 BMA and the BIP, thus breaching those agreements. On or about December 15, 2011, Conoco sent written demands to both Jump Oil and the Defendant which demanded that they pay all amounts due under the 2010 BMA and BIP, which at the time totaled $5,887,130.99, exclusive of any applicable interest and attorneys' fees (the "Debt"). To date, neither the Defendant nor any of the guarantors has paid any amounts Jump Oil owed under the guaranty agreements.

On April 30, 2012, Conoco filed suit in the United States District Court for the Northern District of Oklahoma to enforce the 2010 BMA, BIP and guaranty agreements. Phillips 66 Company later substituted as plaintiff in the case after Conoco assigned its rights in the agreements to the company in May of 2012. The case was subsequently transferred to the Western District of Missouri. In response to the filing of the lawsuit, Melissa Miltenberger filed a motion to dismiss based on her allegation that she did not sign any agreement guaranteeing Jump Oil's debt. In support of that motion, she swore "the signature on the Guaranty is not [her] signature but is a forgery." The forensic document examiner expert hired by Phillips 66 concluded that Melissa Miltenberger did not sign the Guaranty bearing her name. The expert hired by Melissa concluded that it was highly probable that Melissa did not sign the Guaranty.

On June 26, 2014, the Debtors filed their Chapter 7 bankruptcy petition. This adversary proceeding objecting to the dischargeability of the Debt followed. The Plaintiff alleges that the Defendant fraudulently induced Conoco to extend credit by forging Melissa Miltenberger's signature on the Guaranty, and such a representation constitutes false pretenses, false misrepresentations, and/or actual fraud within the meaning of 11 U.S.C. §523(a)(2). The Defendant asserts that there exists no evidentiary support for Plaintiff's allegations.

## II. DISCUSSION

*A. Elements of the Plaintiff's claim*

Section 523(a)(2)(A) provides:

A discharge under 727 … of this title does not discharge an individual debtor from any debt –

(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by –

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition….

To obtain a determination that a debt is non-dischargeable under §523(a)(2)(A), a creditor must prove five discrete elements: 1) that the debtor made a representation; 2) that the debtor knew the representation was false at the time it was made; 3) that the debtor made the representation deliberately and with the intention and purpose of deceiving the creditor; 4) that the creditor relied on the representation; and 5) that the creditor sustained the alleged loss as the proximate result of the representation having been made. *In re Guske*, 243 B.R. 359, 362 (8th Cir. BAP 2000). The standard of proof for each element is the preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991). Any evidence presented must be viewed consistent with the congressional intent that exceptions to discharge be narrowly construed against the creditor and in favor of the debtor in order to provide the debtor with comprehensive relief from the burden of his indebtedness. *In re Cross*, 666 F.2d 873, 879-80 (5th Cir. 1982).

In this case, there is no dispute as to the last two elements: that the creditor relied on the representation and was damaged as a result. Therefore, this Court will focus on the remaining elements that must be proven by the Plaintiff.

B.   *Did the Defendant make a representation?*

The Plaintiff asserts that the first element is satisfied (*i.e.,* that the Debtor made a representation) because the Defendant "orchestrated the forging of Melissa [sic] signature, or at the very least directed his secretary, Becky Bledsoe, to notarize the forged signature. …In any event, Steven knowingly provided ConocoPhillips a guaranty agreement containing false statements and/or a forged signature." Here there was no written or oral representation, so it must be implied from the circumstances. There was no evidence in the record that the Defendant actually presented the Guaranty to the Plaintiff. As discussed below, the Defendant's secretary was primarily responsible for handling the paperwork that crossed his desk and he had no recollection of handling the execution of the Guaranty or its delivery to the Plaintiff. Although the Court is not entirely convinced that the Plaintiff has established the first element, it will resolve its doubt in favor of the Plaintiff.

C.   *Did the Defendant have knowledge of falsity of the representation?*

With respect to the second element, knowledge that the representation was false when made, the Plaintiff frames the question this way: Did the Defendant have a reckless disregard for the validity of Melissa Miltenberger's Guaranty? The Plaintiff answers this affirmatively, contending that Steven Miltenberger directed his secretary to notarize the Guaranty even though Melissa was not present, and then presented it to the Plaintiff as if genuine. The evidence on which the Plaintiff principally relies is  1) Melissa's declaration that "she was not consulted by

5

any party during the negotiation of the Guaranty" and did not know it existed until Conoco filed suit against the guarantors, and 2) Bledsoe's deposition testimony that reads as follows:

> Q: Was it your practice to require people whose signatures you were notarizing to be present at the time that you notarized it?
> A: If they were an employee, yes. The family, not necessarily.
>
> Q: Okay. Why – why not regarding the family?
> A: Well, because Steven was my boss, I trusted his – to tell me, you know, what to do. And if he told me to notarize a document, I notarized the document.
>
> Q: Even if the person whose signature you were notarizing was not present?
> A: I could have.
>
> Q: Okay. Do you recall any occasions where Steven A. Miltenberger came to you, handed you a document with signatures on it and said, "Notarize this," and it wasn't necessarily his signature, it was somebody else's?
> A: I—I don't know the answer.
>
> Q: Yeah, let me…rephrase the question. Was there ever an occasion where Steven A. Miltenberger, the son, came to you, brought you a document with a signature on it that purported to be somebody else other than him? In other words, did he ever come to you and bring you a document that his wife had signed and said, "Hey, sign this, " and she was not present?
> A: I don't recall a situation, but it could be, yes.

This evidence can hardly be characterized as compelling; Bledsoe's testimony is non-committal at best. It cannot be considered evidence that the Defendant knew that Melissa's signature was a forgery. Likewise, the fact that Melissa was unaware of the Guaranty until the lawsuit does not establish the Defendant's knowledge of the forgery either. In fact, there is not a shred of evidence of that in the record before this Court. If anything, the evidence presented by the Plaintiff comments on the Defendant's rather lax business practices or suggests that Melissa's signature was not secured in Bledsoe's presence, but even that is merely a suggestion.

What *is* compelling is the Defendant's testimony in which he denies that he knew about the forged signature or that he played any role in getting it notarized:

Q: And you understand that the signature that purports to be Melissa Miltenberger's signature is a forgery?
A: I understand it's an alleged forgery. I don't know that for sure.

….

Q: During the 2003-2004 time period, do you remember Becky Bledsoe ever asking you whether or not she should notarize a document?
A: No, I don't remember that at all.

Q: Do you remember her ever asking you in person, bringing a document in and asking you should I notarize this?
A: No.

…Q: Based on that memory, do you believe that there was ever any discussion by Becky Bledsoe with you in 2004 about whether she should notarize a document?
A: No. No there was not. … I would remember that.[3]

Further, the Plaintiff's attempt to elicit an admission from the Defendant was not successful:

Q: And so you expressly authorized your assistant Becky Bledsoe to notarize that forged guarantee, didn't you?
A: I did not.[4]

Additionally, the Plaintiff cites to this Court's opinion in *In re Reuter*, 427 B.R. 727, 744 (Bankr. W.D. Mo. 2010), as setting the standard for knowledge of falsity, namely that where the maker should have known that the statement was false, the statement was made with reckless disregard for the truth. The *Reuter* case, however, is distinguishable. As the Debtors noted, numerous red flags existed in that case to alert the debtor that his business partner was different than what he held himself out to be. Those circumstances do not exist here. Nothing in the

---

[3] The Defendant described an incident that occurred some time after Bledsoe ceased to be his secretary, when there was a document that his wife needed to sign. His new assistant, a notary, told the Defendant that she could only notarize the document with his wife's signature if his wife was present. The Defendant testified that this was the first time he became aware of the requirement that the signatory must be present for the signature to be notarized.

[4] At trial, the Plaintiff attempted to discredit Steven Miltenberger by mischaracterizing his interrogatory answer as a ratification of Bledsoe's deposition testimony. Specifically, in response to Interrogatory No. 17, "Please state in detail your knowledge about the circumstances under which Becky Bledsoe notarized the signatures on Jason and Melissa Miltenberger's guarantee agreement," Miltenberger responded, "Defendant has no such knowledge and refers the plaintiff to the deposition testimony of Becky Bledsoe." As the Court stated then and reiterates now, it does not view that sworn response as either an endorsement of Bledsoe's testimony or as an inconsistent statement.

7

record suggests that Steven Miltenberger should have known that Melissa would not sign the Guaranty and therefore, her signature would have to be a forgery. (If, for example, Melissa had been in an unhappy marriage at the time and Steven knew about it, that could be construed as a red flag. The record reflects that Melissa's marriage was good at the time the Guaranty was signed.)

The Plaintiff also cites the Restatement (Second) of Torts to support its claim of recklessness. Section 526 of the Restatement states that "[a] misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies." The Comment on Clause (c) elaborates:

> In order that a misrepresentation may be fraudulent it is not necessary that the maker know that matter is not as represented. Indeed, it is not necessary that he should even believe this to be so. It is enough that being conscious that he has neither knowledge nor belief in the existence of the matter he chooses to assert it as a fact. Indeed, since knowledge implies a firm conviction, a misrepresentation of a fact so made as to assert that the maker knows it, is fraudulent if he is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented. *This is often expressed by saying that fraud is proved if it is shown that a false representation has been made without belief in its truth or recklessly, careless of whether it is true or false.* (Emphasis added.)

In *In re Woolley*, 145 B.R. 830, 834 (Bankr. E.D. Va. 1991), the court explained:

> Reckless conduct refers to unreasonable conduct in disregard of a known or obvious risk from which it is highly probably that harm would follow. It is usually accompanied by a conscious indifference to the consequences. …[T]he conduct must exceed negligence and rise to the level of reckless disregard for truth.

Courts construing this Restatement section in a bankruptcy context reach varying conclusions when it comes to determining whether the scienter element is established. This is because the analysis is driven by the facts of each particular case. However, one principle is consistently applied: the debtor must be "consciously aware." *See, e.g., Gebhart v. S.E.C.*, 595 F. 3d 1034, 1041, 1042, 1044 (9th Cir. 2010); *In re Johnson*, 477 B.R. 156, 170 (10th Cir. BAP 2013)(a breach of duty of care resulting in the dissemination of misinformation does not necessarily implicate knowledge of the falsity of the representation, and does not satisfy the scienter element). That is, a misrepresentation is fraudulent only if the maker "knows or believes the matter is not what he represents it to be." *In re Cribbs*, 327 B.R. 668, 673 (10th Cir. BAP 2005).

In this case, there is no evidence demonstrating that the Defendant was conscious of how the guaranty agreements were signed or notarized. His explanation of his *modus operandi* in running the business supports the argument that he was not aware of any falsity in terms of the Guaranty. He testified that the company's main office, where Bledsoe was located, was two hours away from his home, so he was only in that office one or two days a week. He described his routine as follows. Bledsoe would go through all mail and handle whatever matters she could. On the days when the Defendant came into the office, she would hand him a pile of documents to review or sign, and afterwards, he would return them to Bledsoe so she could do what needed to be done. The Defendant also testified that he had no recollection of receiving unsigned personal guarantees from the Plaintiff, but if had, he would have given them to Bledsoe because "she was responsible for getting the documents out and back in."

The Court acknowledges that the Defendant may have been negligent in his business practices, and perhaps should have been more conscientious in facilitating the execution and

9

notarization of the guaranty agreements. However, even if the Court were to infer that the Defendant knew that Melissa's signature was not made in Bledsoe's presence, the Plaintiff has still not satisfied the element that he knew the signature was a forgery. He denied knowing that Melissa's signature was false. He also denied knowing that the Guaranty was not signed in the presence of a notary. The Court finds this evidence credible. Accordingly, the Court concludes that the Defendant's actions do not rise to the level of reckless disregard of the truth.

D.     *Did the Defendant have the intent to deceive?*

Even if the Plaintiff had proven that the Defendant made a false or misleading statement, it failed to establish the element of "intent to deceive." This requires the debtor to "have acted with the *subjective intent* to deceive the creditor." *In re Johnson*, 477 B.R. at 169(emphasis in original). Subjective intent is often based on circumstantial evidence because a debtor rarely admits to fraudulent intent. *See, e.g., In re Treadwell*, 2011 WL 798833, *7 (8th Cir. 2011)(imputed fraud determination turned on "disputed facts, credibility determinations, and the inferences a fact finder may choose to draw therefrom."). To find fraudulent intent based on circumstantial evidence, the court considers whether "the totality of the circumstances 'presents a picture of deceptive conduct by the debtor which indicates intent to deceive the creditor.' " *In re Davis*, 246 B.R. 646, 652 (10th Cir. BAP 2000), *aff'd in part, vacated in part on other grounds* (citations omitted).

The Plaintiff is essentially asking the Court to draw the inference that because the Guaranty was forged, the Defendant necessarily "tricked" the Plaintiff into entering into the transaction. The Court is unable to do so. In the first place, the Plaintiff produced no evidence of a motive. To the contrary, the Defendant produced evidence of his lack of a motive to engage in fraud. The Defendant testified that the Debtors' relationship with the Plaintiff was "great,"

"long-term," and "a good fit."  In other words, he wished to preserve that relationship, not do something which would poison it.  In addition, "there wasn't any pressure" to get the deal done with the Plaintiff because the Debtors "were shopping other brands with other suppliers."  The transaction was not time sensitive and the company was not desperate to close the deal as it had other options.  Further, if Melissa had not signed the Guaranty, Steven Miltenberger "would have called … our account rep, who was working on that deal and let him know that she's not signing it.  And then, he would have had to go back to his people and see what that meant, if anything."  Whether this is the case or not is not the point; the point is that the Defendant believed Melissa's failure to sign would not necessarily have been fatal to the transaction and thus had no motive to falsify her signature.  The bottom line is that the Defendant established that the Debtors "definitely had options" such that there was no need for them to resort to fraud.  There is conflicting evidence as to whether the Defendant directed Bledsoe to notarize the Guaranty without the guarantor present.  There is no evidence that the Defendant engaged in a pattern of fraud.  In short, the Plaintiff offered insufficient circumstantial evidence from which the Court can infer that the false representation was made with the intent to deceive.

### III.   CONCLUSION

It is well-established that a finding of reckless disregard for the truth in relation to dischargeability should be very narrowly interpreted, and such a finding must be based on evidence of the debtor's knowledge or belief that a matter is not what he represents it to be. Implied fraud is not sufficient.  The record does not support a finding that the Debt should be excepted from discharge under §523(a)(2). The Plaintiff has failed to meet its burden of proving each element, and thus, the Debt is dischargeable.

Date: May 8, 2015          ___/s/ Dennis R. Dow_____
THE HONORABLE DENNIS R. DOW
UNITED STATES BANKRUPTCY JUDGE